My name is Philip Torres and I represent the plane of repellent in this case. Tiffany Nicholson is a pilot for Cape Air, was a pilot for Cape Air. She is coming to this court asking that this court overturn or reverse the grant of summary judgment against her. In 2004, Cape Air started its operations on Guam. On August 20, 2004, it should have been a glorious day for these eight pilots who were selected. On that day, they were all certified to fly the new aircraft. Eleven days later, Tiffany Nicholson was removed from a flight and that started chain events and eventually led to a termination. So these pilots all flung together previously in Hyannis or wherever the company was previously operating? No, they had not, Your Honor. The company was flying single pilot aircraft called the 402s. They were all selected on the basis of seniority and they were all brought together and they were all trained together to fly this new aircraft, which was a two-pilot cockpit aircraft. So when she was removed from that flight, it's significant that she's removed by Captain Charles White, who used to be her boyfriend. Captain Charles White was counseled before they ever went to Guam about his ability to work with Tiffany Nicholson. Nonetheless, she was after what Cape Air said was a failure to retrain properly on her CRM skills, which are communication skills in the cockpit. She was summoned to Hyannis for a disciplinary hearing. At that hearing, or before that hearing, she was given an action form, which is her disciplinary form, which removed her from the ATR program, which is a jet program as opposed to the 402s, which is a prop plane. She was told to come back in three days and asked why that should not be imposed upon her. Upon going there, she was met with accusations that the other pilots didn't want to fly with her and that her CRM skills were deficient. She asked the specifics as to what they were, asked to see the accusations. They had letters from other pilots. She was not allowed to do so. Therefore, she didn't have any sort of substantive due process at that time. Not confronted with any specific allegations, she said, my skills are good. I believe my CRM skills are good. Nonetheless, she was removed from the program. Her contention is that there was plenty of information to, within the record, that this is not a nondiscriminatory motive by Cape Air to remove her on the basis that she's unsafe. The evidence is that the panel knew that there were sexual rumors, there were rumors of sexual activity between her and their chief in Guam, which is Russell Price. And he was the chief accuser in this matter. Also, the problems with Chuck White, who was also the person who removed her. Charlie, did alleged activities take place after she got to Guam? Are these events occurring in Massachusetts? No, Your Honor. They began in Houston when they were doing their simulator training and continued. They became known to Cape Air and Cape Air's human resources manager actually talked to their administrator, Russell Price, and informed him how important it was to be professional. It doesn't matter whether these rumors are true or not. If you have other pilots believing that one of your pilots is sleeping with a boss and this is a person who makes up the schedules and determines who works when, it's going to be a pretty convivial situation. The personnel manager also said that she discussed it with him and at the time, I asked her in a deposition if Mr. Price understood and she said he did not. She did not think he did. Mr. Price, prior to this position, was just another pilot at Cape Air. I gather the CRM skills only become relevant on a two-pilot aircraft. It would not have been relevant particularly at high-end. Well, I think it's a matter of degree. You know, CRM is your ability to communicate in the cockpit. You're always communicating in the cockpit, whether it's with the tower or with any of the parties, with your flight attendant, with the passengers. Clearly... But the only problem identified here is pilot to pilot, pilot to co-pilot, whatever. That's the allegation. But the allegations are coming from the pilots who had a motive to not have her in Guam. Who are those pilots? That would have been the chief of the area, which is Russell Price and her ex-boyfriend. But there are other pilots who also had concerns about her CRM skills in their actual dealings with her. So there was other evidence of that. That's correct, Your Honor. But significantly for that other evidence, all that other evidence stems not from anything that occurred after August 20th when she certified, but before when they're going through the training. Training is designed to... Oh boy, because I got to get this because I thought I read it differently. There are no other evidence after they start flying the jets in Guam from other pilots other than Price and White as to her CRM skills. Is that your position? In other words, there are no pilots out in Guam other than Price and White who said her CRM skills are lacking. The other pilots' complaints dealt with activities that happened before they were certified. For example... I must have misread the record then. I thought that these pilots out in Guam, once they were on the airplane with her in real... in their training, they're in simulators, whatever. Correct. Okay. My understanding was that when she was out in the field flying the planes in Guam with other pilots other than White or Price, that other pilots complained about her CRM skills. Is that wrong in the record? No, you are correct about that. But what is significant is that those actions happened before they were being certified. That's the time when you're... All right, let's just get this straight. You're saying that the complaints were made after she was in Guam, but they referred to actions that took place before she was in Guam? No, I'm sorry, Your Honor. They referred to actions that took place before she was certified by Cape Air as well as all the other pilots. In other words, they referred to her conduct during training in Guam? That's to be sure, before she flew on the planes in Guam. That's right. The training, the actual ILE training, which is the experience on the plane, that occurs for about six weeks in Guam, between the middle... early July and August 20th. If you look at the complaints, especially the director of training and all of his complaints, he says that, you know, she has problems with her CRM and relating to other people. All of that relates to the training. He was part of that training. If he truly believed that, he had an obligation to Cape Air, to the FAA, to its... to their customers, to do something about it. But he certified her without any sort of discipline or concerns. That makes his... his entire letter and the other letter very suspect. So when was... when did this occur when Price had... flew with her and Melissa is one of his top ten scary and dangerous flights? After she was removed from... Was that before or after certification? That was after certification. After she was removed, Russell Price had what Cape Air called a retraining of her on CRM skills. He was observing her on a flight and he alleges in this particular flight that her CRM was bad and it was a scary flight. Did that happen after certification? That happened after certification. Now, we got a problem with McDonnell Douglas, now that you've told me this. What class... what was the protected class and how was she discriminated in that class? She was the only female pilot of the eight pilots that went on to be trained. Okay, now are there other pilots that she was flying with in Guam that had CRM problems that were handled differently from her CRM problems in Guam? CRM is... is trained through your simulator training. That's... Another? Oh, I got another problem. Okay. I thought CRM was when you're out flying the airplane, the real airplane, and the communication skills. Cut the throttle. She didn't cut the throttle. Now, so, you're telling me there's no CRM skills after training? No, it's an ongoing process every day that you do your job. Okay, okay, okay. In the ongoing process in Guam as she's flying the jets with all the other folks, there's eight of them. Correct. Okay. She says that she was treated unfairly or discriminatory as to the class. There's eight people out there. Correct. Are there other of those people, those other seven males, who had CRM problems during that entire dismissal on CRM problems? Partially. There were other... CRM is taught in the simulator. No, no, no. Okay, that's all I'm going to get. Everybody had problems during training, but everybody came out certified. So, you want to take the problems in the training and merge it with the flight operations in Guam, right? No, I don't. What I want to say is that if you have CRM problems, those are addressed in the simulator. People fail their simulator training. You don't know why they fail their simulator training. There's nothing on the record to indicate that they absolutely did not fail because of CRM problems. But those who did fail were allowed to retest and stay in the program. She, when they had concerns about her CRM, they didn't send her back to Houston. Yeah, but she'd already been recertified. She'd been certified. Yes. And she was flying the airplane. Correct. It's a whole different situation. What was the class out there? It was the people who all were certified, wasn't it? Correct. And she was the one that had the CRM problem. Nobody else had a CRM problem out in Guam flying the actual plane, the jets. At that time, no. Okay. However, when they did determine that she had a CRM problem, they did not send her for retraining like they did with the other pilots. The other pilots were allowed to retrain in the environment that they were deficient in and be certified and stay within the program. In her case... Can I stop you there because I want to make sure I understand your argument? When you're in a simulator, that's one thing. When you've got passengers in the back, you've got weather all around you, you've got actual controls and actual jets, that's when she had a problem according to the allegations. Correct. And so you're saying that those are the same as when you're in the simulator. And so she should be sent back to the simulator rather than, didn't they give her a chance to upgrade her skills in the actual plane with people helping her? Well, they started flying with passengers on August 1st. I know, but when the so-called allegations came on the CRM, wasn't she given a chance to fly with the actual pilots to try to retrain her CRM skills and she cut those short on the job during the real flight training, real flight operations? That is what Kate Baer says. Really? That is what Kate Baer says. She says that this wasn't training. These were observation flights. There was no goals that she was supposed to meet. There was no debriefing at the end. There was no criticism or comments as to whether or not how she is doing in this whole process. These were observation flights. And who is she observing? She's observing people who are disqualified 11 days ago, 12 days ago at the same time. Oh, wait a minute. The pilots she was observing were flying jets and had no problems as I understand it. So she was observing pilots who theoretically in the operations were operating properly. Is that correct? Or am I misinterpreting the record? No, I assume, I think you can make that assumption. That assumption. But they had no more experience than she did in CRM. So basically you're complaining about the method of retraining that she was given. Is that the complaint? Our complaint is that she didn't really have a second round of training. Do you think she needed a second round of training? She said she didn't. But once she found out that she was going to be removed from the program, she obviously, you know, rethought her position and said, I'll do whatever you want. I want to stay in the program just like everybody else. And they thought she didn't really need to be sent back in order to go through the full scale thing. They thought that all she needed to correct her problem would be just a few days of observation. And if she passed that, then she wouldn't receive any other discipline. But in the record, she says that when she does this, quote, retraining, she is not getting any feedback. Her interpretation of exactly what happened during those days in Russell Price's are not even close to being reconciled in the facts. She said it was pretextual. I'm sorry? Your claim is that it was pretextual. That's our claim, Your Honor. That the retraining was pretextual. That no matter what she did in that retraining, she would not have been passed? That's correct, Your Honor. But what evidence is there? Well, the evidence, I think, is also in the action form. The action form that she was initially given says, okay, you're going to do this. You're going to go through your EAP communication skills classes and you're going to go through your retraining under CRM. When you finish that, you're not going back to Guam. She was specifically excluded from going to Guam. You're not going to fly the ATR-42s. Nobody else was told that when you finish your CRM classes or your retraining, that you are not going to be back in the program. What would be the basis for her to be excluded from Guam? You mean that she was going to be suspended from that type of operation for a period of time, even if she passed? Correct. Eighteen months, initially. Right. From the ATR-42s. That's right. Right. I mean, let me see if I understand this right, because I think I do. But she was offered the opportunity to go back to Hyannis and fly the Cessna 402s. She was offered to fly the 402s, yes. So in other words, they said, your CRM skills are deficient. She disagreed and you disagreed. And so the action we're going to take is we're going to send you back to Hyannis and you're going to be capped on the 402s. You're not going to fly anything in the Pacific region, right? That's right. Okay. So why did she take that deal? Because it was a demotion back to flying prop planes instead of jets. Also, she lived in Guam. And what would be the reason? If you're concerned. But she lived in Guam prior to being transferred there? No. No. But, Your Honor, if Kate bears concern is your CRM skills are deficient, and it's a process. It's like a quarterback who plays as opposed to a quarterback who sits on the sidelines. The more you play, the better you get. The more you do your CRM skills, the better you're going to get. But then after she goes through these classes, she's going to sit for 18 months. Well, she wasn't going to sit. She was going to fly planes in Hyannis, right? But she's not going to fly. No, I mean, I just want to make sure I understand what they're coming to. They were going to send her back to Hyannis for 18 months and see how she did and then saying that you might re-qualify, you might not for the jets. Sure. Okay. Your time, Senator Brown. We'll give you a rebuttal time anyway. Okay. Thank you. Good morning, Your Honor. I'm David Ledger. I'm also from Guam, and I represent Hyannis Air Service doing business as Cape Air. And I want to just take a few minutes just to clear up a couple points. The ATF. I don't quite understand this discipline. Maybe you could explain this. The problem with CRM, which I gather is personality. It's personality skills, basically, communicating, getting on with somebody else in a cockpit. It's an array of skills, Your Honor, that are required to operate a multi-crew aircraft safely. And being able to get along with your copilot or your first officer or your captain is certainly a core aspect of that. But that's the only one at issue, though. She's not accused of not getting along with the passengers or communicating with the tower properly or anything else. It's just the two people in the cockpit. That's correct. Therefore, that was not a problem in flying in Hyannis for it. No. She only flew a single plane. The single plane, the 402, and during her time with Cape Air. What was the point of giving her some opportunity to observe how people behave in the two-pilot plane and then sending her back to Hyannis for 18 months? Well, that's an easy question to answer, Your Honor. This contention that this retraining by observing other pilots with good CRM skills not actually being training is false. Ms. Nicholson has admitted, and the admission is in the record, that observing other pilots is certainly a means of training and improving one's skills. Okay, but my question was what's the point of doing that for a brief period and then sending her back to Hyannis for 18 months? Okay, that's also an easy one, Your Honor. The retraining that was provided to improve the CRM skills while on the job in Guam, that was a program that was devised by Mr. Price. And the reason that she was thereafter sent back to Hyannis is that she squandered the retraining opportunities. Well, that wasn't part of the original plan. If she had gone through that couple of days in Guam and come through with flying colors, she wouldn't have been sent back to Hyannis. But that's correct. I think that the training program that was devised was more than a couple of days. But essentially that was the plan that the administrator, Mr. Price, had developed. I want you to do these things. Observe other pilots. I want to fly with you. We want to see if you make an improvement. And if the improvement had been made, then there would not have been the need to go back to Hyannis. Their argument is that was all pretextual. Your argument is that it wasn't. That's the word. Well, it's not pretextual at all, Your Honor. Well, I mean, we have said it. So if she had come through that initial retraining in Guam, she wouldn't have been put right back to flying. Yes, there would have been no interruption in her employment in the ATR aircraft in Guam had she successfully completed that training. And it wasn't just Mr. Price that was involved in this training that was offered to her in Guam. There was two people that actually came out from Hyannis. Mr. Phillips, who was the chief pilot for Hyannis Air Service, and Mr. O'Connor, who is the director of safety. And Mr. Price, as the Court is aware from the record, is a career commercial airline transport pilot. So you have three very, very seasoned, experienced pilots trying to assist this individual to come up to par on the CRM in Guam, and that was unsuccessful. And two of those came from Hyannis who were not part of that Guam unit, whatever was going on there. That's correct. Two of the highest-ranking people in the operations department in Hyannis came out to assist in this retraining effort. Now, as I understand it, what happened in the retraining effort is it was she refused to go through the process. In other words, it wasn't that there was a training not in place, but she refused to do what they desired her to do to get the retraining. Am I correct in that? That's correct. Can you tell me what happened? Yes, there's three instances I can tell you. The first instance that Mr. Price wanted her to observe a crew that had acceptable CRM skills. And part of that observation is to observe the crew pre-flighting the aircraft, in other words, going through what needs to be done prior to taxiing and taking off. When Mr. Price arrived at the aircraft to see if she was doing that, she was asleep in the passenger cabin. But he gave her another chance. He told her to go up front and observe what was happening. There were a number of round trips that were available to Ms. Nicholson to participate in as an observer that day. I believe there would have been four round trips or eight legs. She participated in two and then got off the plane. There was another instance, I believe it was the very next day, when she reported to work without a headset. A pilot can't fly without a headset. So she was sent back to get the headset. And I believe the third instance was when she actually flew with Mr. Price. One of your honors mentioned that this was the instance where Mr. Price said it was one of his top ten scary flights in his entire career. That was pretty much the end of the opportunities. And it was clear to the people that were observing what was going on at that juncture that something else had to happen. And something else was to go back to Hyannis. And this contention that these multitude of opportunities were not really training, I think that's quite transparent. In fact, there was an admission that observing other pilots is a good form of training. But she wasn't – Cape Air didn't offer her a position at Hyannis. She still had to bid for the flights, right? No, I don't think that's entirely correct. The program, this revised action form that was provided to her, required her to do some things. She had to go to the – it was an internal employee assistance program where your interpersonal skills are honed. Then they also wanted her to return to the independent flight service school for attention to the CRM skills. But there was never a termination in the sense that she was told she couldn't fly airplanes. In fact, it was quite the opposite. Well, it said maybe reinstated as a C-402 captain, excluding the Pacific region. And that's true. And then, as I understand the facts, and you correct me, she had to go through some bidding process on flights and only bid on the jet flights and not on the Hyannis flights or something. Would you explain that to me? Yes, I will. First of all, just to correct a slight misconception, the ATR-42 is not a jet. It's a propeller-driven airplane just like the Cessna, only it's a turboprop. The Cessna is not a turboprop. I understand. In this kind of aircraft, it requires two crew members as opposed to one. That's correct. Tell me about the same number of seats. No, the ATR-42 actually has 42 seats and the Cessna-402 is much smaller. But the situation in Hyannis was that the revised action form said, we need you to do a few things before we want to put you back in any cockpit. But if you successfully complete what we want you to do, you'll be put back in the 402 and it's labeled a demotion. I think that the fact is that the pay would have been slightly more than what was being earned out in Guam, but it's considered a demotion because the plane is smaller. I take that as the argument. But there was really no question that reinstatement in the 402, the single-crew airplane, was made available. Then beyond that, after successful… Outside the Pacific region, do you fly 402s in the Pacific? Actually, that's a good point. Initially, the 402 was flown in the Pacific region and then it was withdrawn from service in the Pacific region. So by the time these events happened, there were no 402s operating in Guam. They had been pulled out in favor of the larger aircraft. So the 402 was made available to her in the other routes. The form said, excluding the Pacific region, so I assume that if you had 402s there, she wasn't going to be flying them. That's correct. Your response is, we didn't have any 402s. There weren't any 402s out there at the time. They were out there initially and then they were removed. But the revised action form not only provided the opportunity for these additional training on the interpersonal skills and the CRM and reinstatement as a pilot in the 402, it was very clear that if the retraining was completed successfully, that the opportunity to go back to Guam and fly in the ATR-42 was clearly stated in the revised action form. Based on seniority, they didn't specify? No, at that juncture, she just simply would have been reinstated to her prior position. She wouldn't have had to bid for the opportunity to go back out there. That's my understanding of what was offered by the people in Hyannis. What happened after that, again, the label termination has been used. There was no termination. This offer was made to her to allow her to continue to fly, to improve her skills, to re-qualify to go back to Guam, and she simply didn't take it. She didn't take it and somehow it was deemed abandoned and then you fired her. This is part of the record that confused me. It was deemed abandoned? Yes. Well, the employer made the offer to her and the employee did not come back. She bid on these other flights. No, she just never came back. After the revised action form was given to her, this is what we're going to offer you, that was the end of the relationship. She never appeared for work again after that. So at that juncture, the employer determined that the employment had been terminated, but they never fired her in the sense she just simply didn't come back to work. And at some juncture, as an employer must do, they're going to assume that she no longer works here. Certain things have to happen after that. This may be real obvious, but I just want to make sure I have it correct in my understanding. The CRM skills are safety issues. In other words, if we're going to allow pilots in planes and they're going to fly people, they have to do certain things. In other words, they've got to be able to start the airplane up and fly it, but they also have to have certain CRM skills which are absolutely essential to fly a plane to fly faster. They're absolutely essential. Now, when you fly a 402, the CRMs are 402 CRMs in the sense that they're single engine and there's only one pilot. When they got to the two pilot planes, they need to know different CRMs because the CRM has something to do with the interaction of the two people versus on the 402, the person with the aircraft. That's correct. And again, related to the safety of operating because you have the two pilots. And so you're not going to operate two-person aircraft unless you can have those CRM skills. You can't operate it safely. I mean, in order to get in that cockpit, you're going to have to have those CRM skills for that plane, those two persons. That's absolutely correct. It's an essential element of the ability to operate the plane, not just safely, Your Honors, but as other cases in this circuit and other circuits make clear, the requirement that's imposed on airlines is not simply to be safe. The requirement is to be as absolutely safe as you can possibly be. And the record, Mr. O'Connor testified, Mr. Price, who's a career commercial transport pilot, testified at length about the importance of CRM. They cited catastrophic accidents that were caused by the lack of CRM in the cockpit. So this is not, I suppose it goes to the issue of legitimate nondiscriminatory reasons and the lack of pretexts. This is a situation that experienced, seasoned people observed as an accident waiting to happen. A plane full of people, they made the decision. And I think that the court is, I'm sure, aware of decisions in this circuit as well as other circuits that give airlines a fair amount of deference in making decisions as to who flies and who doesn't. Before these eight pilots went to Guam, did they receive the CRM training? They all went together, Your Honor. Yes, there were. And where was that held? It was in it was in Houston. And the initial CRM. Is that a general continuing program you have in Houston for pilots who are going to be in circumstances with more than one pilot in the plane? Yes. The training in Houston basically consisted of ground school, learning about the airplane. It consisted of simulator training. But I'm only asking about the CRM aspect. Is that it was the forces that are designed for CRM? Yes. That training was provided in Houston. And I believe Your Honor asked, is the training ongoing? And yes, the training is ongoing as part of the pre-operational flights that were flown in Guam. Once the pilots were all certified. If you have a continuing operation in Houston for this airline. For Cape Air? I don't understand. Yes, Cape Air. No, the facility in Houston is utilized by airlines all over the country because the training facilities are provided there. And that's why Cape Air sent these eight pilots to Houston. You sent them to what is like going to a university, right? Yes. College. That's correct. CRM. Yes. And she came out of that, as it turned out, not very well. She wasn't there. Well, I believe Mr. Price described he categorized her skills. Stick and rudder skills were acceptable. What about CRM? Well, CRM, I believe he categorized her as sort of on the low edge of acceptability, but okay. And then the training, as I believe Your Honor asked, the training of CRM was to continue without interruption on Guam as a part of everyday flight operations between the crew. I mean, it's not something you go and learn and then you stop. It's ongoing. Everybody's learning CRM skills every day in Guam. Perhaps the more the more accurate label is that every one of the pilots, as they were flying in Guam, were expected to observe and demonstrate acceptable CRM skills. And when they didn't do it, it was brought to their attention. I don't think it can be separated from everyday flying. It's something that is ongoing continuously, sort of like CLE for lawyers. You just need to do it on an ongoing basis. And somebody who turns out, well, somebody who doesn't have technical skills, you would either fire or you'd send them back for technical training. Well, if there were technical deficiencies at the early training stages, you have to demonstrate the technical ability to fly the airplane or you won't graduate to the opportunity to actually operate the airplane. Does anybody ever, after graduating, do you ever discover that somebody really doesn't have those skills? I think, did Cape Air discover? You're asking generally. Generally in airlines. Absolutely. There's always re-qualifying as a pilot is an ongoing process. You have to take rides with check airmen. Cape Air, as many other airlines, expects co-pilots, first officers, to progress and to fly as captains. And there's a different set of skills that are required of captains. So the evaluation of the skills is constantly ongoing. Okay. My question really was, do you send people back to Houston to be retrained if they turn out not to be so good? Yes. They can be sent back and they can be retrained or have another opportunity for training in the flight simulator. And then they would be put back on the line if that training was completed successfully. But the conclusion was that the plaintiff here didn't need that. She just had to see how people flew planes in order to pick up those skills that she was missing. No, that's not correct. When Mr. Price devised the training program and instructed Ms. Nicholson to observe other pilots, it was specific to observing them in connection with their CRM skills, which were deemed acceptable and proper. And the idea was that Ms. Nicholson was instructed to observe how the two pilots interact. And that was a form of training. And she's admitted that observing pilots who do things properly is, in fact, a valuable way to improve one's own skills. Would you ever send a pilot from Guam back to Houston just to get retraining on CRM? That's all. I don't know the answer to that question, Your Honor. In this instance, it was... Well, it's obviously a contract school, so I guess maybe you could contract anything. Well, I think the answer to your question is, in fact, yes, if you think ahead. Because the revised action form that was presented to Ms. Nicholson in Hyannis, actually one component of that was to go back to the flight service academy and work on your CRM skills. And then there was the in-house Cape Air employee assistance program, which essentially just helps you work on your personality. So if she had stayed around, she would have eventually got back to Houston. It was part of the revised action program, absolutely, to go back there and complete that program successfully. I'm puzzled on the termination again, if you don't mind. She says in her affidavit, because I had appealed the September 24, 2004 action form and the review was still underway, in September I bid for a schedule that my seniority allowed for the month of October as an ATR, FO, or captain. My bid was rejected. So she bids for it in October, and then October 29, I was terminated. Well, she's appealed it, she bids, and so after the appeal was rejected, I don't understand what happened. Well, I think... Basically, what she said earlier was she didn't show up for work, but she didn't have any scheduled flights. So I just, there's a gap for me. And you said, well, she didn't show up, so we just had to finally say, gosh, she's not here, but she wasn't terminated. She said she was terminated. I think there's two parts to your question. Yeah, at least. Bidding for the flights, as stated in the affidavit, was something that wasn't available to her because she had been removed from the ATR program at that time. But she thought she was... There was no question that she was removed. Well, she thought, according to her affidavit, we construed it the other way. I understand that. Yeah. Okay. So then what happened is the revised action form was upheld on review. Right. On what date was that? And I can't quote the exact date, Your Honor, but the review was done by Dan Wolfe, the CEO and president of the company and the director of human resources. So it was like late September, early October. Yes. The 29th or something. Okay. So then what happened for the 29th when she said she was terminated a month later? Well, the answer to your question is nothing happened because the plan was provided to her. The plan was upheld. It was approved by the president of the company and the director of human resources. And they said, this is what we want you to do. And if you do these things, you can begin flying again. Were any time limits put on? I don't recall that there was a time limit put in the revised action form for Ms. Nicholson to accept it. But as a practical matter, she just never did it and never showed up again. And at some juncture, as I said, and I can't give Your Honor the exact date, but when we make an offer of ongoing employment under these conditions, under these terms, and then the person never comes in the door again, at some juncture you have to assume that she's quit. Well, I understand that. It's just puzzling to me. It doesn't seem that long. I mean, if she said you have to accept this within 10 days or you'll be fired, I would understand that. But it looked like it was sort of an open-ended offer. Well, it was. I guess that's the proper way to describe it. There wasn't a time limit. And she had to move from Guam to Hyannis. And I'm not – it's just puzzling to me that all of a sudden there's this gap. And then you say you didn't terminate. Well, at some point when the person doesn't come back to work, you have to take steps as a human resources and as a company to say this person no longer works here. We can't allow this to continue. At least first they terminated her. Yes, at that juncture. The distinction is, Your Honor, no one said to her you're fired. What they said was do these things, improve your skills, and you can go back to doing what you were doing before. That offer was declined. Well, and never responded to it. Never responded to it. Correct. Was she made that offer in Guam? In Hyannis. Was she in Hyannis at the time? When she received the revised action form? Yes. Yes. And so all she had to do was show up at the office? Yes. She didn't have to come out for Guam? Did not have to come out. Never showed up. Never showed up. Okay. But was the or else communicated to her? I'm sorry, Your Honor? Was the or else? I mean, the action plan. The action plan didn't say if you don't do this you're going to be fired. I don't know. I'm just trying to figure out what the facts were. It wasn't an ultimatum. It was we want to keep you as a pilot. Dan Wolfe testified that I will do whatever I can to support her continued employment with Cape Air. That's in his deposition? Yeah. And so the revised action plan, I mean, I think as a practical matter, you could assume that if you don't do these things or if you do not complete these things successfully, then you will not get the carrot at the end of the tunnel. You won't be able to fly these airplanes because you're not safe. I get it. Usually there is a document with more precision that you say if you don't do this you're going to be fired. And so here's what we want to do. And your presence, that's why we want to keep her. And then after a while I say, okay, you're fired. I mean, I get your explanation. I think it's implicit in the revised action form that this is what is required of you to continue your employment as a pilot. It was an ultimatum. In that sense. Absolutely. And rightfully so. If she can't qualify to fly the airplane, then they're not going to put her back up there. They couldn't do that. I think it's more than my time. Yes. I would just like to ask the court to affirm the district court of Guam. I think the district court of Guam got it right. There are no genuine issues and material facts on the McDonnell Douglas test. The legitimate reason for removing her from the airplane is so people don't get killed. There's absolutely no evidence that gender played any part. Thank you, Your Honor. The facts in this case are very far apart. What the court. What are the disputed issues? When she's initially removed, she's told that she's unsafe. That would happen on a flight to Saipan, which is a 20-mile flight. She is then put back in the plane. When I get back in the plane, flies all the way back to Guam. Either she's safe or she's unsafe. If the captain believes her to have been unsafe, then he was negligent to keep air into the passengers in that plane. But that instance starts all of this. With respect to whether or not there's a pretext here for their motive, they argue that it's safety that counts. Well, when Congress passed the Civil Rights Act of 1964 and in the last 45 years, they have not exempted the airlines from that. They cannot use safety as an overriding factor. Tell us what the disputed issues, in fact, are where they say X happened and you say Y happened. Okay. They say that they put her through a second round of training. She disputes that she had a second round of training. CRM training occurs in Houston. She was not sent back. All right. But they said that they gave her these opportunities to take certain actions in Guam and that she refused to do them, that she, when she was asked to observe the crew, she didn't participate for the full day. She left after two out of eight flights. The second time, she said she showed up without the necessary equipment. The third time, they say, was this flight in which she did not act properly. Is there a disputed fact about those things? Yes, there is, Ron. On the first flight, when she's accused of sleeping and only doing two flights, she had permission only to do those two flights that day from Russell Price, and he admitted that in his deposition. So she wasn't doing anything that she was required to do. With respect to the headset, out in Guam, if you had a broken headset, which she did, didn't forget her headset, she had a broken headset, there isn't a store down to go buy another headset. She had to find a headset. During the process of finding that headset, that plane had to leave. She got a headset. She continued with her flights the rest of the day. With respect to the third item as to whether or not she participated and did successfully, there's a fundamental disputed fact as to whether or not she participated successfully. She said she did. They said she didn't. She said that's not retraining. They said it is. With regard to Mr. White and his motivations to not fly with her, he says he doesn't want to fly with her. Mr. Price also has a motivation to not have her. She's not one of the boys. She's the only woman out there. And then what does Cape Air do? They say, okay, we're going to retrain you, but when we retrain you and you are successfully passing your CRM classes, you still can't go out there. What would be the motivation? They said that if she succeeded in the opportunity they gave her in Guam, that they would consider that re-qualifying for the CRM. No, Your Honor, they did not say that. They may have said that, but that wasn't the position of Cape Air. Cape Air said we want Mr. Price, who was the administrator, said that he wanted to observe her on flights. He then is critical of her flights, but she takes the opposite position, that she has never received any negative feedback with regard to those or they were treated as training. But it is his letter that motivates Cape Air to send her back to Hyannis. She goes back there. She is back for the hearing, for the two hearings. She's not happy with it. She appeals it as her right, and she returns to Guam. There's another fundamental thing. She returns to Guam. She is suspended from flying the aircraft until that appeal is done. Once that appeal is resolved, but before that appeal is resolved, she's bidding for her next month's flights. Right, so then I guess what happened is she gets a second decision, and then from your perspective, what happens? I assume she rejects the offer. Actually, Mr. White makes his, I mean, Mr. Wolf makes his determination, or the review panel makes its determination, and it's not clear when that determination comes down. She is asked to bid for the 402s, or she can't bid for the 402s immediately, and eventually she is terminated. It's not clear in the record as to how that actually, the decision to terminate her, came about. What's your best evidence on that? Our best evidence is that she went back to Guam, and she's suspended from flying. She then bids as she's required to, and her status, because it's on the 402, I mean, I'm sorry, on the ATR-42, because she's suspended. She's not removed from that program once she appeals. Oh, she's suspended. She bids on the Guam flights. Okay, and then what's your best evidence after that? And there are no 402s in Guam. Right, but I mean, this on the, I have an action plan form dated September 17th. That sound right? That's correct. And it says you are suspended until EAP completed successfully, removed from flight status as ATR-42 crew member, may be reviewed in 18 months, may be reinstated as C402 captain, excluding Pacific regions. That's the one you're talking about? That's right. So did she bid on an ATR-42 flight after that? During the time that it was on appeal, she did. Well, once she got this, it was pretty clear she wasn't going to be flying ATR-42s. Unless her appeal was upheld by Dan Morgan, or it was reversed by Dan Morgan. Oh, I see. This is the initial action form you're talking about? That's correct. Okay, what was the final action? Well, the final action? Did she appeal that letter that Judge Thomas just read to you? She appealed that letter to Dan Wolf. And then when did you receive a response to that appeal? She didn't receive a response to that appeal. As Your Honor pointed out, it's very murky as to why they terminated her. She didn't receive a response to that appeal. But she was on suspension. She didn't have an opportunity to review it. Well, this is what puzzles me about this. I mean, did your client basically say, if I don't have the ATR-42 flight available to me, I'm quitting? There's no evidence of that. None. Well, what's your position? Our position is that she hasn't had. I mean, if that weren't available, was she willing to go back to Hyannis to fly the Cessna 402s? No, our position is she was going to have to go through this retraining for the CRM and for her interpersonal skills, regardless, before she got into another aircraft. Yeah, no. But, I mean, was she willing to take the deal or not? At that point, yes. She had no other option. So why didn't she take the deal? She was never informed that she had to do it. They terminated her. You're saying that she had an appeal pending and you have never heard the result of that appeal? She received. She did not bid on the 402s. No, no, no, no, no. My question is, you said that she appealed the letter of decision of September 17th to Dan Wolfe and she never received a decision from Dan Wolfe? There's nothing in the record indicating she received a decision from Dan Wolfe. Well, did she or not? I mean, is there anything outside the record? You keep saying on the record. Is there something outside the record?  Well, why did she receive a notice of termination? It's in her letter, saying we're terminating her October 29th. That is part of the record. And they asked her, informed her of her COBRA rights, and asked her to return her items. Well, I'm confused. Counsel tells us, or the airline, that she's back in Hyannis when she's given the deal.  Once she had gone through the process in Hyannis, Did she ever get back to Hyannis and still under employment, under suspension? No. So counsel was wrong, absolutely wrong. Yes. After she had gone through the disciplinary hearings, she returned to Guam. And she was under suspension, not given any flights. Let me ask you this. Is counsel right in his assertion that the salary for the 402s was either the same or greater than those for the ATR 42 flights? If they were, they were within a dollar. Okay. So there's no salary reduction, just a reduction in status because you're going back to a prime. That's right. One's a turbine, one's a prime. The other thing that counsel said was that two people came out for her retraining in September. They came out for the initial training. Nobody came out for this supposed second retraining. So that was only the initial one. And, of course, you've got the statement that amounts to quid pro quo discrimination when Chuck White tells her after she's been terminated, a week after, that had we gotten back together, this would have never happened to you. He is her boss. That kind of comment, trade your employment for sexual activity, is inferred to the employer. What issue does that go to? Pretext? Well, all of it goes to pretext. But that is quid pro quo. This is a disparate treatment program. Nobody else who had to be retrained were removed from the program. She's removed from the program 18 months or six months. There's no guarantee that she's going to fly again with them in that ATR 42 plane. So they're not going to fly the 402 until she gets through additional retraining. So is it your position today that she would take a position in Hyannis that flying 402s as a solo pilot with this company? I mean, your position today is that she was ready and willing and able to accept the deal, and somehow there was a misunderstanding about it. Your Honor, when you were terminated as a pilot from your position, you carry that with you everywhere you go. Congress has passed a law, a reporting law, regarding pilots. You apply for another job, they check with who your previous employer is who signs an affidavit under a penalty of perjury. I'm not going to say yes or no to that. Well, OK. The answer is yes, because the sanctions for being terminated as a pilot are severe. And they're crippling to her. Thank you. Thank you very much. Counsel, we'd like to ask you a question. Counsel told us that the letter of September 17 was appealed to Mr. Wolf. Is that correct? Yes, Your Honor. Mr. Wolf and Ms. Markham, the director of human resources, took up the appeal. Did they notify plaintiffs of the result of that appeal? Yes, they did, Your Honor. Is that in the record? I believe it's in the record in the form of an e-mail, Your Honor, but I can't stand here and tell you definitively. But I can tell you definitively that the upholding of the September 17 action form was communicated to Ms. Nicholson. OK. Well, one of the problems, of course, we have is that we are limited to the record, although we might be interested in knowing what the facts are. But in reviewing the case, we're limited to the record. Do you know what the date was when the decision upholding the September 17 letter was communicated to the plaintiff? No, Your Honor. I can't quote you the date as I stand here. OK. Thank you very much. I would say within the 30 days following the review by Mr. Wolf and Ms. Markham. Well, I would assume it would be before you fired her for not showing up when she's waiting for a decision. That's why I say I believe it's within that 30-day period. So do you find it a little peculiar that she says she would be willing and able to take the position? It makes no sense. It can't be. Well, why would it make no sense? It's only a six-month period before she could go back to Guam where she was living. Well, I agree with you 100 percent. From our perspective, it was a perfectly generous offer. We don't know when she got the offer, but we know she was fired sometime maybe shortly after she got the decision. No, the termination did not occur until a period of time had elapsed when it became clear to the company that we gave her the offer. We don't know what that is. We know she was fired on October 29. She got the letter on – the action plan is September 17. She appealed it. Yes. So you gave her a week or two, maybe. Well, it didn't quite happen like that. We don't know how that happens. There was notice given. You said you want her back. You'd love to have her. She said she'd love to work for you again in Hyannis. No. No, it's somehow in this misunderstanding. The chronology of events are this. The September 17th revised action form was presented. The next event was Ms. Nicholson exercised her right to appeal that decision to a higher authority. That was Mr. Wolf and Ms. Markham. The decision – the September 17th revised action form, the decision was upheld. Ms. Nicholson was informed – But we don't know when that occurred, right? I don't have the date. If you say it's in the record, how would we find it? If you don't know, how are we going to find it? It's in – all I can say, Your Honor, is that it's in the record. Let me ask you another question. You said you would have been happy to have her back. We – the – had she completed the requirements of the revised action plan. Had she accepted the action plan, you would have been happy to have her back and she would have gone to Hyannisport and flown planes for at least six months. We had never had any problem with her. Then, if all went well and you kissed and made up, she could have gone back to Guam where she had moved. That would have been fine with the company. That's correct. Counsel says she would have been happy to do that. So everybody would have been happy at one point. Can you kiss up and live together again? We happen to have a mediation program for parties that seem not to get things straight and don't have complete records and find themselves in a problem where litigation may go on forever, where it's not really worth it to the parties that don't really care about litigating but would like to get on with their lives. Hold on. We happen to have a very good program. My question to you is would you be willing to talk to a mediator from the court? I believe we did participate in that program. In our Ninth Circuit mediation program? Yes, Your Honor. We did participate in that program. Did you have more than a pre-conference? I participated in one conference with Peter Sherwood. Face-to-face or on the telephone? On the telephone. Both Mr. Torres and I were on the telephone. And I believe there were subsequent communications. I can't speak for Mr. Torres. There were some other communications between myself and Mr. Sherwood. So we did participate in that. But, Your Honor, the contention that I would have taken this deal had I known about it is just absurd. Not that you knew about it, but of course. We don't know what we don't know. You didn't put in a timetable under accepting or rejecting, nor did you say in your letter. And I'm not arguing with you, but this is just I'm seeing it objectively. You didn't put a timetable on saying if you don't accept it, you're fired. Now, those are issues apart from the central thrust of this, I understand. But it's a little odd here for you to deem to abandon that without any formal action, deadline, or otherwise. In the interest of contract law, that would be very unusual. And there's no question she didn't want to accept this. This isn't what she wanted. That's why she appealed. The question then is if she were told, we know you don't want to accept it, but your alternative is being fired, that's a different problem. I believe I answered that question by saying I believe it's quite implicit in the revised action form that in order to come back to work for us, you have to do these things and complete these things successfully. We were going down this road. I might as well go down with you. Counsel now says they were willing and able to do the borrow-through plan. Today says that. Now, the record doesn't show that that was their opinion then, except here's her argument. I mean, we're now assuming that something happened that today is being represented that she was really unwilling to go forward with the 402 program, but there's this void somewhere in outer space that nothing happened. So where are we supposed to go with this? Are we to assume in today's argument that there was evidence in this record that she was willing and able to go through with the 402 program as offered? There is none. Absolutely none. David Pinanti is right. As I said, we're limited to the record, which may not show that there was ever a ruling on an appeal. We don't know. We have to find out what's in the record, and we have to disregard in order to make a formal decision that you tell us that the appeal was denied unless the record shows that. Maybe it does. We'll just have to rely on the record. It does. It's in the record in terms of the testimony of Dan Wolf. Here's the problem. I work backwards. I say, what's the adverse employment action termination in this case? But it wasn't. You say it's not a termination. That's how you got started answering the question. It was abandonment. How did she abandon? So I kind of stepped along with this whole case. I said, well, what happened at the end? And I think we've found out enough. To be clear, the district court in analyzing the four prongs of McDonnell Douglas, the district court found that she was not qualified for the job. She can't fly. And you presume. I'm sorry. We think that we take. There are no findings of fact on summary judgment. You take the facts in the light. So we argue findings here. I think you got to stop. There was there was a result. Clearly, I mean, you find that she's qualified for the job of flying in Massachusetts. You never suggested she wasn't. In fact, you said she would be qualified for the job. All she had to do is go back and have this, you know, love it. And I said, it's trying to get on with other people. Which she did for a long time when she flew for you. All right. Anyway, we spent a lot of time. We'll look at the record and see where we are. And thank you all very much. Thank you. I hope you don't feel your trip was wasted.
judges: Reinhardt, Brunetti, Thomas